Will the clerk please call the last case of the morning? 4-16-0238 Schema v. Workers' Compensation Comm'n May it please the court? Before you begin, if you wish to be seated, that's perfectly fine. I rolled that around in my mind this morning, Your Honor. And when I stand up, I kind of lean on this, and I don't twist. If I'm sitting, I kind of got to twist, and that kind of overcomes the value of sitting. Well, the clerk informs us that the podium can be, I think, adjusted somehow, if I'm not mistaken, so you can sit. He was very helpful. I appreciate that. The only thing that goes through my mind that kind of makes up for what I'm going through this morning is that Mr. Mueller, our junior, by a few months, he's going to go through the same thing in a few more months, as I understand. So there's some consolation there. I also find it not ironic, but a curious consistency, that this morning 60% of the justices are here to hear the argument of about 60% of attorney with sword. So with that in mind, may it please the Court, Mr. Mueller, my name is Bruce Messore, and I represent Stephen Belito. The arbitrator denied this claim for failure to prove the existence of an occupational disease. The commission affirmed and adopted the arbitrator's denial, and the circuit court confirmed the decision of the commission. The commission's denial was wrong. It was both against the manifest weight of the evidence and wrong as a matter of law. The first error of fact was in the first sentence of the decision. Quote, petitioner testified he began to experience shortness of breath in the 1990s, and that this condition got progressively worse from that time on. Close quote. The arbitrator then tied that testimony about shortness of breath to the treatment records. He said the records don't support complaints of shortness of breath and that there are numerous entries where petitioner did not exhibit shortness of breath. But the basis for the conclusion of the commission is false. The claimant didn't testify to shortness of breath. He testified to breathing problems. There's a big difference between having breathing problems and having a specific breathing problem of shortness of breath. And this error of fact is critical for two reasons. First, the diseases alleged by the claimant, pneumoconiosis, chronic bronchitis, and asthma, or reactive airway disease, are not characterized by shortness of breath. Now, you can have shortness of breath with any lung disease or with most cardiac conditions. But these specific diseases alleged by the petitioner or claimant are characterized by breathing problems such as cough, wheezing, bronchospasms, excess mucous productions, and the treatment records are full of those complaints. Not that much shortness of breath in the treatment records, but the treatment records are voluminous and many of these other breathing problems are in there. Now, there's no testimony or evidence in this record that pneumoconiosis, chronic bronchitis, and reactive airway disease require symptoms of shortness of breath. Or that shortness of breath is even the main symptom of any of these diseases. The condition denial was wrong, as a matter of fact, when it inserted the phrase shortness of breath into the testimony in place of the phrase breathing problems. In its next step, to require shortness of breath in the treatment records instead of just breathing problems, well, that was equally wrong and led us to where we are today. I say the condition denial was against the manifest weight of evidence in requiring treatment records to contain documentation of shortness of breath. There's no base in the record whatsoever to limit claimants' relevant breathing problems to shortness of breath. And there's no testimony or evidence in the record whatsoever to indicate that shortness of breath is a requirement for any of claimants' alleged diseases. The condition denial was also against the manifest weight of the evidence when it discounted Dr. Wagner's diagnoses of chronic bronchitis, black lung, and asthma, quote, because he gave little or no specifics as to the basis for his diagnosis. First, he gave all the basis that he was asked for. He was deposed. Second, the treatment records available to him contained more testing than was had by either Dr. Tudor or Dr. Paul for the two sides, and certainly more clinical data, such as patient histories and physical exams, than was available to Tudor or Paul. Third, he was claimant's primary care physician. He had the treatment records that a prior treater, Dr. Sidwell, who provided care and treatment to claimants for 21 years, and he testified that he relied on those treatment records in establishing the basis for his treatment and care of claimants. So we have the testimony of Dr. Wagner. We have all the treatment records. They come together. That's the basis for his opinion. This man was also treated during the times that he was admitted to Alton Memorial Hospital, and Dr. Sidwell had him at that time and also Dr. Wagner. And all of these records are in evidence. Dr. Sidwell's records include 53 entries of cough, 26 entries of wheezing, 13 of prolonged expiration, 3 of shortness of breath, 28 diagnoses of sinusitis, 10 of bronchitis, and 10 of either asthma, an asthmatic picture, or bronchospasms. They also contain prescriptions, multiple prescriptions, for advert, glovin, asthma cort, robitussin, augmentin, and nasonex. The records from Alton Memorial Hospital include 20 notations of cough, 7 of bronchitis, 6 of COPD, 5 of asthma, and others referring to pulmonary collapse, obstructive chronic bronchitis, sinusitis, and black lung. The hospital records include prescriptions for Flonase, Proer, Spiriva, Simbicort, Prednisone, Albuterol, Azithro, I can't pronounce it, Azithromycin, Ventolin, Tesla, Proventil, Duonef, Cithromax, Atravent, Advair, and Medrol. The hospital records show the claimant was not just cared for by Dr. Sidwell and Dr. Wagner, but also by Dr. Ali, Dr. Gupta, and Dr. Kapoor while he was at Memorial Hospital, and they all said the same thing. This record proves conclusively that Mr. Blito was under care and treatment for breathing problems, which ranged all the way from chronic bronchitis to pulmonary collapse. Dr. Wagner was a treating physician. All of these records constitute parts of the bases for his diagnoses and opinions. Dr. Wagner testified that he relied on the diagnoses and records of Dr. Sidwell. It is impossible to imagine that this wealth of testing and treatment supported by this many physicians doesn't provide an adequate basis for Dr. Wagner's diagnoses. In fact, even if the Commission didn't accept the diagnoses when they were given by Dr. Wagner by way of his deposition, there's no reason given in this decision for rejecting the same diagnoses which were contained in the medical records of both Dr. Sidwell and Alton Memorial Hospital. The Commission rejected Dr. Paul's opinion also. That conclusion was wrong as a matter of law. Dr. Paul was rejected, quote, because his opinion was based at least in part on petitioners having been short of breath for the preceding 10 years. As I've already stated, shortness of breath is not a requirement for any of the diagnoses of Dr. Paul. In addition, there's no requirement under the law that every basis for a medical diagnosis must be specific and accounted for for any of that diagnosis to be correct. The diagnosis of pneumoconiosis doesn't require shortness of breath. In fact, the testimony of both Dr. Paul and Dr. Tudor prove you can have pneumoconiosis without shortness of breath. The diagnosis of pneumoconiosis is based on the chest x-ray. The diagnosis of chronic bronchitis is based on the PFTs and the frequency of cough. The diagnosis of reactive airways disease, or asthma, was based on the PFTs. It's all in the testimony. There's no testimony in the record that requires a finding of shortness of breath for any of the diagnoses made by Dr. Paul. Entries of shortness of breath are found in the treatment record. Respondent has stipulated to that in his brief, but there aren't many. Dr. Paul gave no testimony at all concerning how much consideration he gave to claiming shortness of breath, or whether he attributed it to coal mining or smoking history. In the testimony regarding shortness of breath, Dr. Paul also mentioned the methacholine challenge results, coughing, and smoking. And the purpose of that testimony was just to explain why he chose a diagnosis of chronic bronchitis instead of a diagnosis of asthma. It wasn't to establish a lung disease, just which one. Finally, the commission stated that when Dr. Tudor examined claimant, he was not under any treatment for a breathing problem. But Dr. Tudor testified, quote, on page 15 of his deposition, He did receive medicine that is used to treat breathing problems. According to my note, it's only Advair. I'm sure that he received albuterol sometimes as well. Close quote. At arbitration, the claimant showed the arbitrator the two inhalers he was taking. The record, including Dr. Tudor's testimony, proves that the commission was wrong. Claimant was taking breathing medication at the time of Dr. Tudor's exam. And I don't know how that fails to constitute being treated for breathing problems. Dr. Tudor also testified that just the exertion of taking the PFTs alone made claimant cough to the point of having vasovagal response. He could barely finish the PFTs because of his cough. And he also said, Tudor also said, coughing with that kind of exercise is something that could be consistent with reactive airway disease, one of the diseases alleged. But even if claimant was not having breathing problems at the time of that examination of Dr. Tudor, even if at the time of Dr. Tudor's exam he was not under breathing medication and was not under treatment for breathing problems, at the time of Dr. Tudor's examination, there could be no doubt that he was treated for breathing problems, both before and after that examination, 20 years before, four years after. I don't think a rational trier of fact can look at these treatment records, claimant's testimony, Dr. Paul's report and deposition, Dr. Wagnon's report and deposition, and not conclude that claimant was under constant treatment for several breathing problems, including multiple chronic medications. The commission was wrong on the facts to conclude that claimant was not under treatment for breathing problems at the time of Dr. Tudor's exam. And it would be wrong as a matter of law to base a denial on an assumption that claimant was not under treatment for breathing problems for one month out of a 20-year period of otherwise continuous treatment for breathing problems. Dr. Tudor found claimant to have no pulmonary disease at the time of his exam. He was wrong according to the entirety of the medical records and every other physician in this record. Dr. Tudor also said claimant was under no treatment for his breathing, and as I've said, that was grossly wrong by the treatment records and by Dr. Tudor's own testimony. I respectfully request the court to reverse the commission denial and remand the case to the commission with instructions to grant claimant a wage differential award. Thank you. If you'd like to counsel, you'll be able to reply. Counsel, you may respond. Thank you, Your Honor. May it please the court, Mr. Rousseau. I'm Bob Muller on behalf of Monterey Coal Company. The commission decision here is clearly not against the manifest way that the evidence. The starting point here, for me anyway, is Dr. Tudor's testimony and his report, which obviously are in evidence here. First of all, the commission indicated that that opinion, that testimony was more persuasive. In other words, they found it was entitled to more weight than anybody else's opinion in this case. And why would that be? Is that appropriate here? Well, Dr. Tudor is board certified in internal medicine and pulmonary diseases, so he has the qualifications. He saw the claimant personally, took a history from him, did a physical examination on him. He reviewed pulmonary function studies, which were done on the same day he saw him. He reviewed chest x-ray films, which were done on the same day he saw him. In the pulmonary function studies, in addition to the regular studies such as Dr. Paul did, there was an exercise portion, which was not in Dr. Paul's, and there was a blood gas study, which was not in Dr. Paul's. Based upon all that data, and with reasonable medical certainty, Dr. Tudor testified that this guy did not have evidence of coal worker's pneumoconiosis. He also did not have evidence of any dust-related lung disease. He had no evidence of COPD, no evidence of chronic bronchitis, no evidence of emphysema, and no evidence of bronchial reactivity. He didn't have anything wrong that would lead Dr. Tudor to diagnose any lung condition. In my opinion, that by itself, that testimony is enough to establish that the Commission's decision in this case is not against the manifest weight of the evidence. There's nothing to say there was anything wrong with that testimony of Dr. Tudor. Now, counsel has mentioned this part about breathing treatment. What Dr. Tudor said was, initially, there was, the claimant was not taking any breathing medications on a regular basis, because what this guy told him was that he had taken Advair in the past, but that the problem really had gone away, and now he was only taking it once every month or two. And as I said, he's not taking any medications on a regular basis. That was his testimony. Same thing. When was he taking that medication? Well, he was taking it years before. When he was in the mines. My understanding, Your Honor, is he was taking it, yes, yes, at least partly when he was in the mines. And now he's no longer in the mines. Right. Yeah, the mine closed at the end of the year 2007, and therefore his job at the mine ended at the same time. He worked until the mine closed. So he's not exposed to dust and other contaminants, am I correct? After the end of 2007, you mean? Right. Yes, no. There is no evidence in the record that he was exposed to any dust or contaminants. I mean, he drove a vehicle, and maybe he had dust on the road, but there's not any evidence. Which might explain not having to take that medicine as frequently, right? It could be. Again, I don't think I got this out, but Dr. Tudor indicated he was not under any actual treatment for a breathing problem. Similar to the testimony, he's not taking any medication on a regular basis. He's not really under any care. He does have this medicine on hand that he can take, apparently, that is still left over, but that doesn't mean he's in or under any actual treatment. I think I addressed this sufficiently in my brief, the part about Dr. Paulson. Well, does he have to be under treatment, or is it we're talking about the existence of a condition? I mean, there are conditions that just are not treatable. I don't think the treatment makes any difference, Ron. It was addressed by my opponent, though. It is in the commission's decision, so I'm addressing it. I don't think it matters. As I said at the beginning, I think the most important thing here is what Dr. Tudor had to say, because he said there's no lung disease here related to the guy's employment with Monterey, and that's exactly what the commission said, and they said, that they found, I think they said it was more persuasive, but they gave more weight to his testimony, and I think that's justified under the facts that are before us here. And why is he entitled to more weight than the other? Well, in my opinion, they found that. Yes, they did. And they're entitled to find that, in my opinion, because they're the prior effect here. My opinion is he's board certified, as I said before, in internal medicine and pulmonary diseases. Dr. Wagnon's not. Dr. Paul's not board certified in pulmonary diseases. We're talking about pulmonary diseases here. I mean, that number one is a good reason to give his opinion more weight. Number two, as I also said before, his pulmonary function study was much more involved, including an exercise portion and the blood gas study. So he's got a more involved pulmonary function study, which has more data, which, again, it's all normal, suggesting, of course, the guy doesn't have any pulmonary diseases, certainly no diseases related to his employment with Monterey Coal Company. Based on that, I think they're finding that it's entitled to more weight is more than justified. The petitioner's testimony, excuse me, the claimant's testimony here is that he has breathing problems. He talks about being out of breath. He talks about being short of breath. He's throwing it all in there. I think it's splitting hairs to say, oh, wait, he was just talking about breathing problems, and that doesn't necessarily mean shortness of breath. He used all the phrases, and that's fine. It's just that's the way he was talking, but it all refers back to the same thing, in my opinion. If you read through his testimony, that seems clear. I don't think that's – I think Dr. Sidwell's records do not support his testimony, and they don't support what he told Dr. Paul. The Commission got that right. Anyway, Your Honors, I think there's plenty of evidence here to establish that the Commission decision is not against the manifest way to the evidence. I would ask that you affirm. Thank you very much. Thank you, Counsel. Counsel, you may reply. First thing I want to say is that great deference is owed to the Commission when they make a weighing judgment. They can choose Dr. Tudor over Dr. Paul. They can choose Dr. Tudor over Dr. Wagnon and Dr. Paul. Now, when you start – keep adding doctors to it, at some time they can't do that anymore because it's just wrong. But the point I'm making is not whether they have the right to make this weighing analysis, but the basis was wrong. They said, we believe in Tudor because Tudor said he wasn't being treated. And if you go into Tudor – So you don't dispute that Dr. Tudor did find no CWP? He found no CWP. That's correct. But he also said he was not being treated. And that was in the decision as the basis for them deciding Dr. Tudor was the most persuasive. But Dr. Tudor said he was wrong. He said he was taking two different kinds of medicines. Now, maybe splitting hairs, but I think that's treatment. Also, and I don't think this makes any difference whether they can choose Dr. Tudor or not, but he happened to be the only doctor in the record that we know took and failed the B-reader test. They could still pick him. I go back to the basis. The basis they gave for choosing Dr. Tudor was wrong. That they cannot do. They weighed improperly. The basis being? The basis being that the man was under treatment. You look at all of his records, and if you look at the testimony of Dr. Sidwell – I mean Dr. Wagner – Dr. Sidwell treated this man for 21 years, then took a job at Alton Memorial as a hospitalist. So he was left without a doctor. Then after a short period, he took Dr. Wagner on as his doctor. Dr. Tudor examined him, and two months later, he first saw Dr. Wagner. So yeah, he might not have been seeing a doctor at the time on the day that he saw Dr. Tudor. He was between them. But that's clear in Dr. Wagner's records. And this man was on continuous treatment in, I think, the common parlance or common understanding for almost 20 years, going back to when he was in the mines. And that's a very important point. When he was in the mines, Dr. Sidwell, in 2005, took pulmonary function tests that were very bad. And those were relied on by Dr. Wagner. And he referred to them. He said he remembered those. And then he was asked in his deposition, well, okay, they got better at Dr. Paul's exam. And they got better at Dr. Tudor's exam. Well, of course they did. He was working every day as an underground coal miner exacerbating his reactive airways disease and his chronic bronchitis. His PFTs were bad. He gets out of the mine. Sometime later, Dr. Paul examines him. They're getting better. Sometime later, he examines him, and they're getting better yet when Dr. Tudor examined him and took those PFTs. But that doesn't mean the disease went away. It means he's not there aggravating it every day. So what's the evidence in the record of the existence of the disease? We have Tudor saying no disease, right? Tudor says no because on the day he took his examination, the PFTs were normal. Well, if you're a doctor, you find normal PFTs, what are you going to use to base your decision he's got disease on? He didn't have the records. So, you know, I'm not even saying Tudor's wrong on that day. But even if he was right on that day, it's inconsistent with everything else. And what I want to point out is you know how he was when he was in the mine, that his PFTs were bad, and they were bad through the treatment of the Dr. Sidwell. And you know that Wagner said he was bad. After he saw Dr. Tudor, he was admitted close to death to Alton Memorial Hospital on December 2, 2012, and the admission diagnosis was cough. The discharge diagnosis was bronchitis and COPD exacerbation. On examination, there were coarse secretions, crackling sounds in the airway suggestive of bronchitis. He was given COPD medication because of his remote history of smoking and exposure to coal mine dust for a long time. He was then given these medications, Flonase, Pro-Air, Spiriva, Simbicort, and Prednisone. This was less than a year after he saw Dr. Tudor. So I mean we've talked about chain of causation or chain of events. There's no question he was treated up to that time. There's no question Tudor was wrong, but he was receiving breathing medications. He was still taking those medications when Dr. Tudor saw him. And then he started treating again, and he was bad again. All I can say about the history Dr. Tudor took is that I'm not going to criticize Dr. Tudor. He's a doctor. But I will tell you this client of mine is not the greatest historian in the world. He's answered Dr. Tudor's questions. And so I say based on the entirety of this medical record, the decision of the commission was wrong. Going back in and looking for sharpness of breath as the basis of their decision to decide he had no disease, that was wrong. If they'd have gone in and looked for all his breathing problems, as he testified to, they'd have found all these. And they'd have had a different answer. Thank you. Thank you, counsel, both for your arguments in this matter. It will be taken under advisement that the written disposition shall issue. The court will stand in recess until 9 a.m. Wednesday morning. Thank you.